Case No. 25-5425, Teva Pharmaceuticals USA, Inc. at all. Appellants v. Robert F. Kennedy, Jr. in his official capacity as Secretary of Health and Human Services, and Mehmet Oz in his official capacity as Administrator of the Centers for Medicare and Medicaid Services. Mr. Morata for the appellants. Mr. Baldy for the applies. Mr. Morata, good morning. Thank you, Judge Henderson, and may it please the Court, Sean Morata on behalf of the appellant at Teva, if I can reserve three minutes for rebuttal. The Inflation Reduction Act, like all major pieces of legislation, is a compromise. One goal of the IRA, as the government says, is to lower the price of prescription drugs, but it also has its purpose to maintain important incentives to both innovate and to bring lower-priced generics to market by ensuring that they are not selected for negotiation too soon and that generics can knock drugs out of price controls, therefore allowing the market to do its job. In the time I have, I'd like to focus on the jurisdiction, the qualifying single-source drug, and bona fide marketing. I'm happy to talk about rightness and due process to the extent the Court has questions, of course. With respect to the jurisdictional bar, Teva is not challenging the determination of any qualifying single-source drug. Instead, it is challenging the definition of the standard that CMS uses to decide what constitutes a qualifying single-source drug, and we know that for two common-sense reasons. First, we brought our lawsuit before OSDETO or OSDETO-XR was even selected for the program. And second, we are challenging the guidance standing alone. As the Court is aware, under the IRA, beginning in IPAE 2029, you have regulations that are going to serve the purpose of the guidance. If you can challenge notice-and-comment regulations, which I think the government would have to concede that we do, we can certainly challenge the guidance that take the place of that. But on the text of the judicial review bar itself, this Court is not writing on a blank slate. Congress used the word that you cannot challenge the determination. And in cases like McNary, in Grace, and in Casanares, the Supreme Court and this Court has laid out the line as to what is challengeable and what is not challengeable when the word at issue is determination. You can't challenge particular factual conclusions, but you can challenge the general written policies that govern those conclusions. Here, we are challenging the general written policies. And we have the courage of our convictions with respect to that line, because one slam-dunk argument that we have is that even under the government's own definition of qualifying single-source drug, as inaccurate as we believe as it is, OSDETO and OSDETO-XR are not owned by the same manufacturer because two different entities own the two NDAs. But we're not challenging that in this lawsuit because it's barred by the judicial review bar, because that is part of the determination as to what constitutes a qualifying single-source drug. Instead, we have to go a step backwards in the process and say that we are challenging the overarching definition. The government's response rests on Nova Nordisk from the Third Circuit. But as we point out, Nova Nordisk in that case was asking for much different relief. It was asking for the deselection of its particular drug, which is the very thing the judicial review bar bars. If the Court doesn't have questions on its jurisdiction, I'll move over to the qualifying single-source drug definition. Here, the IRA lays out a four-step process, and you have to move through all four steps. It's a convoluted statute, as many things are in the Medicare Act, but it's fairly clear what the order of operations. First, you determine the universe of qualifying single-source drugs using the definition that Congress laid out. Second, you determine how much you are spending on those drugs, aggregating across forms, dosages, and expenses. Third, you put those spending in a rank-order list. And then, four, depending on your IPA year, you cut off the number of drugs, and those are the drugs you are going to select for negotiation. Our case is about step one. What is the universe of qualifying single-source drug? The problem is that the statute that the government relies on, the aggregation provision, is looking at stages two and four. It's saying, when you aggregate, when you select, look across all of these things. But those statutory definitions have baked into them a presumption that you have already decided what the qualifying single-source drug is, because it says you aggregate across the qualifying single-source drug. So you don't look to one application? You don't look to one application, but you do look to one NDA, and the government says, well, why would you say applications if you didn't mean a single active moiety? And our brief explains that. It's that you can have supplements, you can have amendments to a single new drug application. And so our reading makes sense of all of these provisions. It's a more modest reading than the government has, but it still makes sense of everything that's in the statute. And it's very common. It makes sense of the provision that says that CMS must consider data that is aggregated across dosage forms and strengths of the drug, including new formulations of that drug, such as an extended release formulation, and not based on a specific formulation or package size, et cetera. Because in your case, your extended release formulation is under a different NDA. So how would this provision apply to your case? Well, it applies to our case because there are different NDAs. You don't do the aggregation, but you can have extended release. Doesn't that suggest that your interpretation is wrong because they intend you to do the extended release formulation? Oh, not at all, Judge Pan, because you can have extended release under the same NDA. We note in our reply brief dimetamine, for instance. It's an older drug, but you have an extended release that is a supplement to the initial NDA. It's also relatively common to have different forms of a drug to fall under a supplement to the original NDA. So Eliquis, which is a selected drug, has an oral suspension. But doesn't this all suggest that Congress didn't intend to be limited by NDAs because they want extended release formulations to be included in the aggregation? I think that's a super — Regardless of NDAs. Well, I think that's the key point. It didn't say regardless of NDAs. Well, they don't mention NDAs. They don't want NDAs to limit this. They want extended release formulations to be included in the aggregation. Oh, no, but I think what they're saying is sometimes extended release is under the same NDA, sometimes it's not. And when it is under the same NDA included, it's not limited to drug product. This is a section that's — That's your interpretation, but it's not supported by the statutory text, which wants it included regardless of the NDA. I mean, I think you are adding, Judge Pan, regardless of the NDA. Because it just says we want it included. Why should NDAs stand in the way of this? This is what Congress wants. Oh, but what Congress wants is it wants aggregation across forms and dosage and package size for the same NDA. Because that's the key point of the steps I was talking about at the beginning, which is that, you know, the provision that we're talking about — What's your best argument for what Congress intended that? Sure. So what Congress intended that for this reason, first, they were adopting FDA's process. They were importing the FDA approval process into the IRA. And even the government agrees — That doesn't mean that it's focused on NDA. It can just be drugs that are approved. Oh, but I think even the government agrees that if you carefully walk through the set of cross-references that Congress put into the IRA, you end up at Section 21 U.S.C. 355, which is an NDA —  It's the backdrop, and it's the soil that Congress put it in. But if you want a policy reason for it — No, I'm trying to understand why you think Congress intended this based on this statutory language. Sure. Because it uses the word drug throughout and talks about aggregating all these different things across dosages. And so when I say it's question-begging, Judge Pan, what I'm saying is you have to assume what is the drug. And you find out what the drug is by going to Congress's reticulated definition of qualified single-source drug. But doesn't this suggest that the way that it talks about drugs, that they intended the whole thing to be aggregated? So the CMS guidance says it's across dosage forms and strengths. And then we have in Section D1A, you know, the data that is aggregated for expenditures is across dosage forms and strengths of the drug, single drug, including new formulations of the drug, such as extended release formulation, not based on specific formulations or package size. On the drug price, it must consider applications and approvals under 355C for the drug. I mean, this doesn't suggest that we're limiting based on NDAs. And also CMS must compute and apply the maximum fair price across different strengths and dosage forms of a selected drug, and not based on specific formulation or package size. I mean, it's just the whole statutory scheme suggests it wants to aggregate different forms of the drug. There's no suggestion that it should be limited by NDA based on what they're trying to do here. Well, because what NDA is, it tells you what the drug is. I mean, I think in the FDA world, you do a lot of acronyms, so it sort of hides what the concept is. NDA is new drug application. So an NDA is a – so if something is a separate NDA, and as we point out, FDA does police the line between supplements and new drug applications, it is reasonable for Congress to say that when FDA has determined that something should be a new drug application, that is a new drug and is therefore a different drug. So an extended release formulation of the exact same drug could be under a new NDA. Well, it's not the same drug. I think that's the point. Okay, of the same active moiety. Well, and I think that's the key point, which is Congress never used the word active moiety. Congress is aware of the concept of active moiety. Congress never used the word NDA. It does through its series of cross-references. By getting you to 355, it gives you a NDA-specific – I would argue that they meant active moiety then. I do not. If you look at the entire intent of this, what they're trying to do is figure out what are the most expensive drugs. So those are the ones that we'll negotiate. And they want to go across different dosages and formulations, et cetera, and those are the ones we're going to negotiate. They don't want to carve out what you're saying based on NDAs and have an inaccurate picture of what people are spending all their money on on drugs. But I think, again, it is assuming the conclusion of what the drug is. And the point is that we find out what the drug is through the definition of QSSD. I know that that's your theory, but it doesn't seem to be consistent with congressional intent and what they're trying to do with this whole program. I mean, I think – but I think because the IRA is a set of compromises, we figure out how those compromises come out in the wash by looking at the language they're using. And this is a section that's entitled clarifications and determinations. And what the government is suggesting is that that clarification is a very big tail that is wagging the reticulated definition of qualified single-source drug that appears separately in the statute. When Congress says this is what qualified single-source drug means, it excludes all the other definitions that aren't included. And I think that's the key point. And you can still have aggregation under our view, including aggregation of XR. But I just think the definition of qualifying single-source drug necessarily has to be by NDA. They could just mean as covered by Part D of the statute and is approved under Section 355C. It could just be, as the government posits, just things that are approved by the FDA. But the FDA only approves by NDA. I mean, the whole world of FDA approvals is the FDA does not approve active moieties. It approves by NDA, but all of the different drugs under different NDAs are all approved under 3355C. So there are other ways of interpreting this without limiting everything to NDAs. I think it's just not the way FDA- Because the language just says under Section 355C. That doesn't mean under each specific NDA under 355C. It could just be everything that's been approved. But FDA approves applications for new drugs, and that is an NDA. They also approve supplements, et cetera, right? Right, and they do so under the initial NDA. And I don't even understand my friend from the government to say that I'm inaccurately describing FDA's system. They are just suggesting that, well, the IRA means it somehow differently. It's a different- It's generally approved by the FDA without getting into the weeds of by NDA. Why can't that be an appropriate reading of this? I think it's not the better reading. I think it's because Congress borrowed the FDA system as they found it rather than trying to modify it. Why isn't it the better reading? Because it's consistent with all the other provisions which seem to suggest that Congress wanted to aggregate across all different formulations, dosages, et cetera. Because it leads to all sorts of surplusage. Because, remember, the statutes we're talking about say you aggregate across the qualifying single-source drug. If Congress meant all of that to be baked into the definition of qualifying single-source drug, then why do they have all these additional sections that the government is relying on? In the government's view, qualifying single-source drug by itself has already gotten you to active moiety, and that tends to be the problem. I think they were also doing other violence to the statute, which they then have to patch over. So, for instance, they have the problem where, where are we getting this notion of the same manufacturer from? That's not in the statute. Well, they say, well, because it's active moiety, but because it's the manufacturer, we have to look at whether it's the same manufacturer or not. Because you have to negotiate with each manufacturer. But I think it's much easier under our reading to say that, well, the manufacturer is the NDA holder. Now, whereas under the government's view, you have, and then they say we're doing all of this to prevent product hopping or we're doing this to prevent gamesmanship. But the gamesmanship that the government does not protect against is you just give the NDA to a different subsidiary, and then they are different manufacturers. And FDA doesn't lease that or control that. I think that's a problem. You also have the problem under the government. I'm just thinking this through, as I said here. If two different manufacturers have drugs that use the same moiety and they're, do the same thing, and together they account for maybe they're the most expensive drug in America, then most people, everybody's using this moiety from these two different manufacturers. I guess they're different manufacturers. Yes, but under the government's view, they don't get aggravated. The purpose is to figure out what is the most expensive drug, and that's the one that we're going to negotiate. And I just feel like your interpretation seems to undermine that. But I think the government does, too, because I think sort of reasoned out in real time, if they're different manufacturers, they don't get aggregated, so they don't get negotiated. And that's the problem. So they also have the problem that when it comes to knocking out things from price controls, you can have drug products that do not have generic competition. So, for instance, if there's a generic capsule that knocks out the tablet, even though the people who rely on tablets are not going to have a cheaper generic, which is Congress' entire goal, which was to say that we have generics knock out when there is effective competition, and here there wouldn't be. But under the government's view, they accept that that would lead to knocking it out because of their reading of aggregation, which, again, seems contrary to how Congress wanted to interpret the statute or how Congress wanted this to work out. Because for people who take tablets, maybe because they need to split it in half to receive a different dose or something like that, or because they need to crush it up or something else, the capsule is not a replacement. And so they're going to be subject to a more expensive brand name drug because of how the government is aggregating across NDAs. Can we go on to your marketing argument? Sure. Okay. So with respect to bona fide marketing, the government seems to essentially throw all in on the notion of they need to prevent bad faith marketing. But the reality is when it comes to inflation remates, when it comes to the Medicaid drug rebate program, when it comes to Hatch-Waxman, three programs that all use the same word, marketed, there was no similar concern about bad faith marketing. And there's a reason for that, because the Office of Patrolling Bad Faith Marketing is the antitrust laws, it's the state attorney generals, it's the antitrust division. Isn't the term is marketed governing disprovision? Sure. So it's is approved and is marketed pursuant to such approval, which if you distribute the is, it is marketed. But even if you think that that creates pain… It means that one generic drug being pushed into the marketplace is not is marketed. So I think there is a couple things, Judge Childs. Even if you take the is marketed tense to require an ongoing marketing, there is no de minimis exception to it, which is what we really take issue to. And I think some of the government's arguments go to the question of whether there is marketing at all. But there is nothing that were in the statute that says bona fide marketing, which is something above and beyond marketing, clearly, because it's a different set of words. And, of course, Congress uses the words bona fide throughout the U.S. Code. They use it in the Inflation Reduction Act. Congress knows how to say bona fide when they want. And the real problem that you have with the government's interpretation is that for the drugs, like some of Teva's generics, that are going to be marketed very close to that March 31st cutoff, the forms of data they are going to be relying on are inherently time lagged. And so what the government gets is an extra year of price controls because they won't deem it bona fide marketed, whereas if they simply ask is it marketed, we will certainly show that that product is on the market. Even if it is not in exactly the way or in according to the inchoate bona fideness that CMS has decided to place upon it. So then what context would you say that CMS couldn't try to detect any sham or any fraud with respect to marketing, even if you don't use the term bona fide marketing? I think you could say that like if it's the sham one pill, maybe that just isn't marketing under the dictionary definition. But there's no like de minimis requirement or like a quantity that must be on the market at any given time or be reflected in certain sets of data or something that is beyond simply showing that the drug has been exposed to the market and is available for purchase. Which again is the same thing that CMS does in all of these other contexts when they have asked, is a drug being marketed? So doesn't your argument have to boil down to the definition the agency has adopted conflicts with the statute? It does. Like the statute cannot allow them to interpret marketing in this way? That's right. Because even though I think you have an argument, I don't see that their definition of marketing is precluded by the statute. Well, the question is whether it's precluded. I think it's whose is best under the statute because we're not under Chevron anymore.  But I think it's also that. But why is there not best? Because it should be a genuine marketing because that's the whole purpose of this to see whether or not there really is competition from a generic drug. Because Congress didn't say bona fide. I mean, they have to acknowledge they are adding words. Because why would they want it to be a sham generic that one has been sold and it was with an agreement between the drug company generic. So I think there's a couple different things, Judge Pan. The government tries to back me into this corner where they say, well, what you're defending is fraud. And I'm not. All I'm saying is that fraud would be allowed. I'm not saying fraud would be allowed. I'm saying that fraud is being policed not by the Inflation Reduction Act, but by the antitrust division and all the state's attorney generals and the private plaintiff bar. That if we collusively agreed with someone else to only sell one pill to knock their innovator out of out of price control, I would not want to be their class action counsel is all I can say. And so I don't think it's unusual for Congress with Congress also not wanting there to be fraud within this provision. I don't think it's allowing for fraud. If that's what Congress sort of had in its mind, you think it would be expressed in the text and it's not. Well, maybe it shouldn't need to be because they have the whole purpose of this. It seems that the intent is to actually talk about real generic drugs that are available and therefore affecting prices. But again, throughout the Medicare Act and through other health care statutes, we have had the same on off definition of market without any of the same concerns about fraud or CMS saying, well, but how are we going to solve the problem of only one pill? So, to say that when Congress took a term that it has been used in this field for a very long time, the word marketed, why not? Why have it mean something different here than it does in all those other programs? And that, I think, is the thing that the government struggles to explain. Unless the court has further questions. Thank you. Mr. Baldy. Good morning. May it please the court, Maxwell Baldy for the government. I'd like to circle back to the judicial review bar and talk about what these determinations are that CMS is required to make under the statute and why I think they fall squarely within the judicial review bar. And so to do that, I want to just take a second to discuss how drugs are selected for negotiation. This is all in 1320 F-1 and in three subsections. In subsection E, CMS has to determine what qualifying single-source drugs are. So, it identifies all FDA-approved prescription drugs, run Medicare, that are at least seven years old and for which there are no generic competitors. And then it excludes some things from that definition, generic drugs, plasma-derived products, orphan drugs, things like that. That's the step, subsection E. In subsection D, it has to determine the negotiation eligible drugs. So, again, it's expressly instructed to use data aggregated across forms and strengths, including new formulations. It takes a list of qualifying drugs. It removes small biotech drugs and drugs that have already been selected. It aggregates the spending direct data, and it ranks them by Part B and Part D spending. And the top 50 Part B drugs and the top 50 Part D drugs are negotiation eligible. Third step, selection. This is subsection B. CMS takes the negotiation eligible drugs, combines B and D spending for each drug, ranks them by total spending. And then, depending on the year, it will take the top 10 or 15 or 20. That's it. It is a completely nondiscretionary process in which the inputs inexorably lead to the outputs. So, when Congress says in 1320F7, there shall be no administrative judicial review of the selection of drugs under 1320F1B, the determination of negotiation eligible drugs under F1D, and the determination of qualifying single-source drugs under F1E, it is referring to that process where there is no way to distinguish the definition and how that definition is applied from what comes out of it. And I think when you look at it in this context, this statute intends to preclude review of the kind of challenge that TEVA has brought here. What is your best case on that? Because this circuit has gone both ways as far as the justiciability of statutes as complicated as these. Yes, Your Honor. I think DCH Regional Medical Center is our best case. So, this is a statute that provided additional payments to certain hospitals that was equal to – you have to multiply three factors estimated by HHS. And Congress said there should be no administrative review of any estimate of HHS for the purposes of determining those factors. And this court held that the provision brought a challenge to the data sources and methodologies used to compute the factors. And it said the reason that the judicial review bar covered those provisions was that the two were inextricably intertwined. And so the review bar precludes review of both. I think that is our best case. It's not our only one. I think, you know, the structure of the statute making specific reference to the determination under this section is very similar to this court's opinion, your opinion in Knapp, where Congress said that there was a prohibition on reviewing a process under a certain paragraph. And this court said that was best read to refer to the entire process, and the statutory cross-reference confirmed that. And how do you distinguish this from McNary? So, McNary is about procedural opportunities, not substantive relief. McNary was a circumstance where you had an agency making determinations based on a hearing process about whether people could be granted a certain immigration status. And the plaintiffs there sued and said, we're not challenging the determination that we're not eligible. We're saying that the process that you've set up for this hearing is fundamentally unfair. We want a due process holding that the process that we need a different process, and then we'll go run this whole procedure again, and maybe we'll win or maybe we'll lose. But it'll be, you know, it's a collateral attack on the process. Whereas here, the inputs and the outputs are the same. And when those two things can't be distinguished, then the review bar has to cover everything. And I think the way you know that — McNary didn't limit itself to procedures, did it? Even though it concerned procedures, the language in it is broader than that. McNary is a case — It doesn't preclude review of general collateral challenges to practices and policies by the agency. That is — McNary was a case about procedures, and there was some broader language in it. And this case in — this court in many cases has sort of had to put meat on those bones because this court gets more of these preclusion cases than any other court. So I would point, for example, to the description of McNary's holding in Federal Law Enforcement Officers Association. And that's a slightly different case because it's about channeling rather than strict preclusion. But it's an explanation of McNary and how it was, you know, this court has interpreted that language more narrowly. But if courts can't review CMS's statutory interpretation and CMS essentially tries to interpret in a way that would rewrite a statute, you're trying to say that we don't have an opportunity to look at that? I think that's what preclusion judicial review means. That's what it always means. And if CMS were to go off the rails, the remedy there would not be judicial. It would be political. It would be up to Congress to rein in the agency. But I think the way you know that this statute means to preclude, you know, the determination, for example, of what the definition of a qualifying single-source drug is, and that sort of determination, is that if that judicial review provision, which specifically calls out all these things, didn't preclude this kind of challenge, it's really unclear what it would preclude. I think the only thing that — It precludes the selection of the drugs and the determination of which drugs and which prices. Right. It doesn't preclude the procedures and the policies. There's a presumption that we can review things like that. So, Your Honor, there is no discretion in CMS's part to select a drug. Right? It is a — it's not like they get a list of the top 50 and then they pick the 10 that would be most effective. They make a list. They rank the list. They select the top number of drugs on the list. There is no discretion in that process. I think the only thing that this review bar would cover would be an Excel error, that they've, like, added the numbers together incorrectly. And that just does not seem to me to be — what Congress said in F7, it took all of these specific determinations and said, this is precluded, this is precluded, this is precluded. To think that what Congress meant was there is preclusion if the agency did the math wrong, but not preclusion of the actual decisions that are leading to the determination of what a qualifying single-source drug is. That just doesn't strike me as a plausible interpretation of what Congress did with this judicial review provision. I think what Congress wanted to do here was to say, look, this is a high-stakes program. There is a lot of money involved. Every manufacturer involved in this is going to sue, and that is what has happened. I think we want to preclude judicial review of some set of these decisions so that we can — the agency can launch this program and get going, and we can start experiencing the benefits to both Medicare beneficiaries and the FISC without tying it up in litigation for years. So I can move on to the merits, but I don't want to leave this topic too quickly. So on the merits, I think, look, the statute says across the board, aggregate, aggregate, aggregate. That is the direction of the statute. But I think I want to start by pointing to something my friend said, which is to say that he wants you to look to a highly articulated definition of qualifying single-source drug. There is a circularity problem to his definition, too. 1320 F1E1 says that a qualifying single-source drug means a covered Part D drug or a Part B drug that is described in any of the following. There's two subparts. A is drug products. B is biological. A, drug products. A drug, MDASH. And then three restrictive characteristics that is approved by the FDA within seven years, and there's no generic. But we have to start with, what is a drug? That is not defined here. We give drug its ordinary meaning. A drug is a substance used in the diagnosis, treatment, or prevention of a disease or as a component of medication. The ordinary understanding of drug is not, what was the administrative process used to approve it? The ordinary meaning of drug is, what is this thing that you put in your body to treat a disease? If you were to take three kids to a pediatrician, they all have strep, and they get the same antibiotic to treat strep. The youngest gets, like, a liquid suspension. The middle kid gets a chewable tablet, and the oldest one can swallow pills and gets pills. And you were to say, are all three kids taking the same drug? Everyone would say yes. No one would say, well, I don't know whether they approved in separate NDAs or not. I don't think Congress brings into this process the idea of an NDA. I think what Congress says when it's coming up with this list is, you know, yes, it has to be approved under 355 by the FDA. We are not covering experimental drugs. We're not covering drugs that are only available in Europe and not yet approved here. Like, that is the universe of things. It's a broad universe. It is everything that is approved that Medicare and Medicaid are paying for that meets these criteria. But I don't think that that means, you know, this sort of statute, if Congress had said we want this NDA-specific version, if we wanted to bring this concept in, this is about the most obscure way you could write the statute. You have the ordinary meaning of a drug, or you could say, well, Congress didn't say a drug means any drug product approved under a single NDA or supplement thereto. If that was what Congress said, that was reading its best. It didn't say that. It didn't say anything like that. It said we're operating in the realm of FDA-approved drugs. And would that include the generics then? Well, it would not include the generics because when a generic is approved, then it comes out of the definition. And we're obviously, we're talking here because of the structural scheme, the structure of the scheme. We're talking about negotiating with a manufacturer, not some sort of, like, sectoral bargaining with anyone who has an interest in this, like, in this single active ingredient. So we have to make sense of this scheme together. But it skips a step to say, well, a qualifying single-source drug is a drug that meets these criteria. You still have to figure out what a drug is, and a drug has an ordinary meaning. My friend referred to subsection D3, the aggregation provision is, I think, both the tail that wags the dog and potentially a surplusage. I don't think those things are true. In each of these steps, Congress has told the agency how this aggregation should happen. So in D3, it says you're looking at data. What data are you looking at? How are you considering it? Consider all of this data together. At F3E1D, it talks about what the agency is looking at when it makes an offer of price, and it says look to applications and approvals. And I agree that that includes supplements to a new drug application. But there's nothing in that text that excludes multiple new drug applications. It refers to applications. In F5A2, we're talking about computing and applying the price across different strengths and dosage forms in the same way. That, again, is the sort of determination that at that stage, this is how you apply it. And, you know, that isn't necessarily obvious that you would say every formulation has the same price. That might be the way you would proceed. It might not. The manufacturing cost might be different. Congress made a decision there. But the entire structure of this scheme, everything pulled together, the words, the purpose, the structure, all tells you that CMS's interpretation is the best. All right. Thank you. Do you want me to address generic competition or no? I don't think. Do you have any questions on that? I don't think so. Thank you, Your Honor. The judgment should be affirmed. All right. How about two minutes for Mr. Murata? Thank you, Your Honor. Let me address the notion that Congress is using a common-sense definition of drug in the statute. The Medicare Act does a lot of things through obscure ways, but it's not using common-sense definitions of drug. Because if you were to take three kids to the pediatrician and say one gets an oral suspension, one gets a tablet, one gets a capsule, are they all taking the same drug? Parents might say that, but doctors might say, well, actually, I need the oral suspension to work exactly the same way. And the way I know that is because FDA has done the work and the manufacturer has done the work to ensure it. Or I need a tablet because I actually need for my pediatric patient to cut that tablet in half. And the way I know that's going to work exactly as well as the capsule did is because the manufacturer did the innovation necessary to make that happen and did it by making a new drug and a new drug application. And the reason, for instance, the generic is not included, even though amoxicillin is going to have the exact same therapeutic effect as the brand name, is because Congress had to use the technical meanings of these terms to carve it out of the statute. Before I sit down, I just want to say one practical thing about timing, which is that it is essential for TEPA that we get a decision before the end of the year. Because under Part D, as Vince mentioned in the brief, the government is not directly paying for these medications. It's third-party plan sponsors that do so. If we were to prevail after January 1st, there would be a lot of questions about how that money comes back. And so we would ask that when the court is taking into account how to order its docket, that they keep that in the loop, unless the court has questions. All right. Thank you. Thank you.
judges: Henderson; Childs; Pan